## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| GREG PENN, <br><br> Plaintiff, <br><br> v. <br><br> MBNA CORP., BRUCE L. HAMMONDS, KENNETH A. VECCHIONE, JOHN R. COCHRAN, III, RICHARD K. STRUTHERS, and LANCE L. WEAVER, <br><br> Defendants. | CIVIL ACTION NO. <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, individually and on behalf of all others similarly situated, by his attorneys, alleges the following based upon the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel is predicated upon, among other things, a review of public filings by MBNA Corp. ("MBNA" or the "Company") with the United States Securities and Exchange Commission ("SEC"), conference calls and announcements made by the Company, press releases issued by the Company, media reports about the Company, publicly available trading data relating to the price and volume of MBNA's securities, and a review of reports issued by analysts who followed MBNA.

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of himself and all other persons or entities who purchased or otherwise acquired MBNA common stock on the open market, other

than defendants and certain related persons and entities, during the period beginning on January 21, 2005, through April 20, 2005, inclusive (the "Class Period"), to recover damages caused to the Class by defendants' violations of the federal securities laws (the "Class").

2.    Plaintiff alleges in this action that, during the Class Period, defendants engaged in a scheme to artificially inflate the market price of MBNA securities and to defraud Class members by making misrepresentations and nondisclosures of material fact concerning the Company's ability to meets its growth objectives.

3.    On April 21, 2005, the Company announced that its 2005 earnings per share would be significantly below its 10% growth objective as a result of higher payment volumes from U.S. credit card customers. The Company further announced that it would be forced to reinstate its zero-percent interest card programs in order to regain customers and compensate for its failure to meet its earnings guidance, despite the fact that the Company had previously held the position that such programs had a negative effect on the Company's business.

4.    In response to the disclosure of the true state of the Company's financial condition, MBNA stock, which had closed at $23.11 on April 20, 2005 and had traded as high as $27.95 during the Class Period, plummeted to close at $19.28 on April 21, 2005 after trading on a heavy volume of 51.8 million shares. Before the Company's inability to meet its earning guidance was revealed to the market, however, company insiders unloaded over 2.8 million shares of their own MBNA stock at prices that were artificially inflated by their false and misleading statements and omissions of material facts.

2

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C.

§1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, as

amended, §78j(b) and §78t(a), and Rule 10b-5, 17 C.F.R. §240. 10b-5, promulgated thereunder by

the SEC.

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b). The Company maintains its principal executive offices in this District and

substantial acts in the furtherance of the alleged fraud and/or its effects occurred within this District.

7.    In connection with the acts, conduct and other wrongs alleged in this Complaint, the

defendants, directly and indirectly, used the means and instrumentalities of interstate commerce,

including the mails, telephone communications and the facilities of a national securities exchange.

## THE PARTIES

8.    As set forth in the attached certification, plaintiff purchased the securities of MBNA

during the Class Period at artificially inflated prices and was damaged thereby.

9.    Defendant MBNA is a Maryland corporation with its principal executive offices

located at 1100 North King Street, Wilmington, Delaware, 19884. MBNA, according to its website,

is the world's largest independent credit card issuer. The Company, which has operations throughout

the United States and in Canada, Ireland, Spain, and the United Kingdom, also provides retail

deposit, consumer loans, and insurance products.

3

10.    Defendant Bruce L. Hammonds ("Hammonds") is, and has been at all relevant times, MBNA's President, Chief Executive Officer, and a member of MBNA's Board of Directors.

11.    Defendant Kenneth A. Vecchione ("Vecchione") is, and has been at all relevant times, MBNA's Chief Financial Officer and Vice Chairman of MBNA's Board of Directors.

12.    Defendant John R. Cochran III ("Cochran") is, and has been at all relevant times, the Chief Operating Officer of MBNA. He is also the Chairman, Chief Executive Officer, and President of MBNA America, and was formerly the Chief Operating Officer and Chief Marketing Officer of MBNA America.

13.    Richard K. Struthers ("Struthers") is, and has been at all relevant times, Vice Chairman of MBNA and MBNA America.

14.    Defendant Lance L. Weaver ("Weaver") is, and has been at all relevant times, Vice Chairman of MBNA and MBNA America, as well as a director of MBNA America.

15.    Defendants Hammonds, Vecchione, Cochran, Struthers, and Weaver are collectively referred to herein as the "Individual Defendants."

16.    As officers, directors and/or controlling persons of a publicly held company whose common stock is registered with the SEC under the Exchange Act, traded on the New York Stock Exchange, and governed by the provisions of the Exchange Act, defendants had a duty to promptly disseminate accurate and truthful information with respect to the operations, business, management, earnings, present and future business prospects, to correct any previously issued statements that had become untrue, and to disclose any trends that would materially affect earnings and the present and future financial operating results of MBNA, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

4

17.     During the Class Period, the Individual Defendants were senior executives of MBNA and were thereby privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Because of their top executive and managerial positions with MBNA, each of the Individual Defendants had access to adverse non-public information about the Company's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, each of these defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public.

18.     The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected, particularly with regard to defendants' repeated mischaracterizations of the Company's ability to meet its earnings guidance. As a result, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore responsible and liable for the misrepresentations contained therein.

19.     Each of the defendants is liable as a direct participant in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as officers and/or directors

of MBNA, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause, and caused, the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, these defendants were able to and did, directly or indirectly, control the conduct of MBNA's business, the information contained in its filings with the SEC, and public statements about its business.

20.    During the Class Period, defendants, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to misrepresent the results of MBNA's operations and to conceal adverse material information regarding the finances, financial condition, and results of operations of MBNA as specified herein. Defendants employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of conduct as herein alleged in an effort to increase and maintain an artificially high market price for the common stock of MBNA and to increase their own remuneration as a result. This included the formulation, making, and/or participation in the making of untrue statements of material facts, and the omission to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon plaintiff and the other members of the Class.

## SUBSTANTIVE ALLEGATIONS

21.    The Company is an international financial services company providing lending, deposit, and credit insurance products and services to its Customers and describes itself as the largest independent credit card lender. Through its subsidiary, MBNA America, the Company is the leading issuer of endorsed credit cards, marketed primarily to members of associations and customers of financial institutions and other organizations.

6

22.    On January 20, 2005, the Company issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share – Increases Dividend 17% to $.56 per Common Share – Announces New $2 Billion Common Stock Repurchase Program." The press release reported that the Company had been performing very well, especially in comparison to its competitors in the credit card industry. Specifically with regard to earnings, defendant Hammonds indicated that the Company was outperforming its peers, stating that "[w]e grew earnings 15% in a slower industry growth environment."

23.    The Class Period begins on January 21, 2005, when the Company filed a Form 8-K with the SEC announcing that its objective was to increase its earnings per share by 10% in 2005 and by an average of 12% per year over the next several years, excluding the impact of a previously announced restructuring charge of approximately $300 million to $350 million pre-tax that the Company would take in the first quarter of 2005. The Company explained that it believed earnings growth in 2005 would primarily be driven by improvements in credit quality and reduced expense growth rates. The January 21, 2005 Form 8-K was signed by defendant Vecchione.

24.    In an analyst call on January 21, 2005, defendant Hammonds indicated that the Company was poised for continued and increasing success in the coming months, stating that "business is as good today as it has ever been."

25.    Likewise, defendant Vecchione stated during the analyst call:

[O]ver the last 18-24 months, MBNA has focused on new business opportunities which should help to expand and diversify our basket of products and services. We believe we are well-positioned to take advantage of any improvement in industry growth. [Emphasis added.]

7

26.    Defendant Hammonds emphasized that he was confident in the Company's earnings projections and indicated that the 10 percent growth target for 2005 took into account the current trend of credit card industry growth rate decline, stating that:

> We expect earnings growth to average about 12 percent over the next several years. There will be years when it's more than 12, and years when it's less than 12. And in fact, in 2005, we expect it to be more like 10 percent. We expect it to the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

27.    Defendant Hammonds further emphasized his confidence in the Company's ability to maintain earnings growth regardless of the state of the market by stating that "[w]e have successfully demonstrated that we can grow earnings in high and low asset growth environments by carefully managing the other components of earnings."

28.    During the same January 21, 2005 conference call, defendant Vecchione also emphasized the Company's ability to achieve its earnings growth target even in a sluggish market, stating that "we plan to meet our 2005 earnings target of 10% even if the industry has slower growth than expected."

29.    Defendant Vecchione further stated:

> Here is an example of how MBNA's earnings growth will be achieved in both a slower and stronger growth environment. In a slower industry growth environment, we would see moderate loan growth. We would expect expansion of our risk adjusted net interest margin. Our other income will grow at a measured pace equal to loan growth. We will focus on expense efficiencies and employ our stock repurchase program to generate 12% earnings growth.
>
> *    *    *
>
> In either [a slower or a stronger growth environment], we believe we will be able to produce strong earnings growth averaging 12%. [Emphasis added.]

8

30.     Defendant Hammonds also indicated during the January 21, 2005 analyst call that the Company would benefit from its decision to reduce its zero percent interest loans. According to defendant Hammonds, this decision would favorably affect the Company's financial condition; he cited "the impact of moving away from zero rates" as one of the primary reasons why the Company expected its "asset growth to pick up." During the analyst call, defendant Hammonds explained:

> As I said earlier, zero is bad, I think, for the entire industry, but I know it's bad for MBNA. It forces you to reprice many of your other customers to pay for it. That's not the way to run a business, to take your long-term customers and reprice those to bring in new customers at zero. And just a personal opinion, I think it can make your marketing and advertising areas very lazy. If you can give things away, you sure don't have to be creative.
>
> So we are moving away from zero and focusing on replacing these programs with rewards programs. It's better long-term profitability, and it's better for the customer. Now, this chart [referring to chart in power point presentation to analysts] shows you why we do that. The line of the top is what happens when you put on a zero rate loan.
>
> You can see the balance billed is much faster, early activation and high balance transfers, but over the long-term, full rate loans balances actually exceed zero, just about at the 9-month mark when we get ready to reprice our zero-rate loan. So, it makes no sense for us to continue to do those zero-rate loans, with very few exceptions. The rewards programs give us opportunity to reinforce the affinity relationship. Zero certainly does not leverage affinity marketing.
>
> Now again, like I said earlier, we decreased our $4 billion in zero-rate loans in the U.S. This is what will happen next year. It will continue to come down, as I said earlier, through the second quarter and the early part of the third quarter and then it will normalize. We don't love the impact that that has on our top line, but it is absolutely the right thing to do.
>
> So, that's how we plan on leveraging our affinity marketing to further diversify and grow profitable loans. [Emphasis added.]

31.    Also during the January 21, 2005 call, defendant Hammonds explained that the Company closely monitored its customers' accounts, particularly those accounts with high interest that were subject to negative amortization, stating:

> In terms of negative amortization, we started working on this several years ago. <u>And I will tell you we go in and look at all of our accounts every month</u>. We look at accounts that are not amortizing your balance, meaning they're cutting into their principle [sic]. And we adjust their payments. And we've been doing that for at least 2 years, raising payments on those customers.

32.    Shortly after the January 21, 2005 announcement, company insiders sold significant amounts of their MBNA stock for proceeds totaling $76,478,261.  Specifically, the Individual Defendants' sales were as follows:

| Date | Individual Defendant | Shares | Average Selling Price | Proceeds |
|------|----------------------|--------|-----------------------|----------|
| 1/25/05 | Kenneth A. Vecchione | 100,462 | $26.75 | $ 2,687,000 |
| 1/25/05 | Lance L. Weaver | 376,835 | $26.76 | $10,085,574 |
| 1/27/05 | John R. Cochran, III | 531,159 | $26.53 | $14,091,000 |
| 1/27/05 | Bruce L. Hammonds | 351,409 | $26.51 | $ 9,315,044 |
| 2/3/05 | Richard K. Struthers | 457,464 | $26.84 | $12,277,922 |

33.    On March 15, 2005, the Company filed its Form 10-K for the fiscal year ended December 31, 2004. The Form 10-K, which was signed by defendants Hammonds and Vecchione, again emphasized the Company's prospects for growth regardless of the market climate, stating that:

> For MBNA, 2004 was a year of noteworthy performance.  Thanks to the efforts of the talented and dedicated people of our company, <u>we grew earnings 15% in a slow industry growth environment</u>, launched several exciting programs, such as our partnership with American Express, and acquired important new businesses.

\*      \*      \*

10

Since 1982, we've delivered consistent, profitable growth - something we believe will continue, though at a slower pace than in the past. Through the late 1990s, MBNA grew earnings 25% and averaged 20% since our IPO. However, that pace slowed in 2004 as MBNA gained scale and as growth in the U.S. credit card industry declined.

In this slower growth environment, MBNA produced another year of earnings growth through increased retail spending from our Customers, expanded product offerings, product diversification, continued commitment to credit quality, and tighter cost controls. [Emphasis added.]

34.    On April 6, 2005, the Company announced an update to a previously announced internal restructuring plan in a Form 8-K/A filed with the SEC. The Company made no mention of its earnings guidance or its progress in meeting its earnings growth target in the April 6, 2005 Form 8-K/A.

35.    The statements referenced in ¶¶ 22-34 were materially false and misleading when made because, among other things, defendants failed to disclose the following information:

a.    that the Company was experiencing unexpectedly high payment volumes from U.S. credit card customers, particularly on its accounts with higher interest rates;

b.    that the unexpectedly high payment volumes reduced managed loans in the quarter more than in prior years, particularly on accounts with higher interest rates, which adversely impacted the Company's yield on managed loans;

c.    that although the Company had represented that its decision to reduce zero-percent interest credit card programs would strengthen its financial position and position the Company for future success, that in fact this decision caused the Company to lose customers; and

11

      d.     that as a result of the increased payment volumes and loss of customers, the Company would be unable to meet its 2005 earnings guidance.

**Additional Scienter Allegations**

    36.    Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants acted with a knowing or conscious and deliberate disregard for the falsity of the Company's public statements.

    37.    As further evidence of scienter, prior to the April 21, 2005 news and during the Class Period, the Individual Defendants sold their own MBNA stock at artificially inflated prices. Specifically, in the two week period following the January 21, 2005 analyst call, insiders unloaded over 2.8 million shares of MBNA stock at an average selling price of $26.70 for total proceeds of nearly $76.5 million.

    38.    For example, on January 25, 2005, defendant Vecchione sold 100,462 shares of his MBNA stock for over $2.6 million and defendant Weaver sold 376,835 shares of his MBNA stock for proceeds of over $10 million. On January 27, 2005, defendant Cochran sold 531,159 shares of his MBNA stock for proceeds of over $14 million and defendant Hammonds sold 351,409 shares of his MBNA stock for over $9.3 million. On February 3, 2005, defendant Struthers sold 457,464 shares of his MBNA stock for proceeds of over $12 million.

39.     The sales of stock by the Individual Defendants from January 25 through February 3 were uncharacteristic behavior. The January 25 sale was defendant Vecchione's first sale in three years; defendant Vecchione's last sale of MBNA stock was on March 15, 2002.

40.     Furthermore, defendant Weaver's $10 million sale of MBNA stock on January 25 and defendant Cochran's $14 million sale of MBNA stock on January 27 were more profitable than their previous sales. Similarly, defendant Hammonds's January 27 sale of stock resulted in proceeds larger than those he received from previous sales. For instance, although defendant Hammonds received over $9.3 million from his January 27 sale of MBNA stock, he received only $4.6 million in proceeds from a previous sale on June 4, 2003. Likewise, although defendant Struthers received over $12 million from his February 3 sale of MBNA stock, he received only $4.1 million in proceeds from a previous sale on June 16, 2004 and only $5 million in proceeds from a previous sale on November 7, 2003.

41.     As illustrated by the Individual Defendants' positions with the Company, they had and used their influence and control to further the scheme alleged herein. The Individual Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results. The Individual Defendants were privy to and directed the making of financial projections and results. By making the misleading statements contained herein the Individual Defendants knew that they would artificially inflate the value of the Company's securities. Defendants' actions in doing so resulted in damage to plaintiff and the Class.

**The Truth Begins to Emerge**

42.     The truth about MBNA's financial condition was revealed on April 21, 2005, when the Company announced its financial results for the first quarter of 2005. In a press release filed on

13

a Form 8-K with the SEC, the Company revealed that its net profit for the quarter had plunged 94%, reporting that:

> [N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax. Without the restructuring charge, net income was $514.1 million or $.40 per common share.

43.    The Company also reported that:

> the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

The Company did not disclose in previous press releases issued during the Class Period that it was experiencing high payment volumes on its credit cards, despite the fact that, by its own admission, the Company closely monitored its accounts on a monthly basis..

44.    The Company further announced that "[b]ased on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significant below its 10% growth objective" – despite the fact that the Company had repeatedly insisted that it was certain to achieve its stated growth target.

45.    An April 21, 2005 <u>Wall Street Journal</u> article reported that in response to MBNA's failure to achieve its earnings target, the Company would be forced to "reintroduce the zero-percent pricing practices that it had abandoned last year as too costly." The article stated that, according to defendant Vecchione, the significant decrease in income was caused in part because "some of the MBNA customers paying the highest rates had paid down their balances <u>by shifting their accounts</u>

14

to other banks offering zero-percent introductory rates and by tapping home-equity loans."
[Emphasis added.]

46.     Although defendants had stated numerous times in the January 21, 2005 analyst call that the zero-balance loans were bad for the Company's business and that the move away from such loans would strengthen the Company financially, defendant Vecchione was now quoted in the Wall Street Journal article as saying, "We now have to respond and come back to zero-percent pricing" to counteract the Company's failure to achieve its earnings target.

47.     Indeed, the Company's decision to reduce its zero-percent loans was in fact one of the causes of its poor first quarter 2005 performance. In an April 21, 2005 article on Bloomberg, Legg Mason Wood Walker analyst Chris Brendler stated that "MBNA's results show pressure from their move away from zero-percent introductory rates."

48.     In reaction to this news, MBNA stock, which had closed at $23.11 on April 20, 2005 and had traded as high as $27.95 during the class period, plummeted to close at $19.28 on April 21, 2005 after trading on a heavy volume of 51.8 million shares.

49.     In response to the Company's disclosure, Jason Tyler of Capital Management in Chicago, which holds 10.8 million MBNA shares, stated:

> Management has lost a lot of credibility....For the first time in their history they give earnings guidance, and they can't get there. There certainly is a little egg on their face right now.

50.     Likewise, Anton Schutz, president of Mendon Capital Advisors, who owns MBNA shares in two portfolios he manages, was quoted in the April 21, 2005 Wall Street Journal article as saying, "It looks to me like these guys are broken in terms of growth."

51.    Similarly, analysts Chris Brenner and Richard W. McCaffery of Legg Mason stated in an April 22, 2005 report entitled "Unsettling Change in Strategy" that:

> The surprise was MBNA's decision to backpedal on its strategy to protect its margin with variable rates and reduced 0% teasers. Instead, MBNA now appears willing to sacrifice margins/profitability to attempt to hold on to customers. As a result, mgmt withdrew EPS guidance... We are exceedingly cautious as we believe the abrupt change in strategy is a very negative signal.
>
> *      *      *
>
> As a result, despite an inexpensive stock, we are resisting the temptation to bottom fish. Essentially, we believe fundamentals get worse before they improve, and our confidence in mgmt is shaken. At the very least, it will likely be several quarters before fundamentals begin to improve. [Emphasis added.]

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this case as a class action pursuant to Rules 23 (a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who purchased or otherwise acquired MBNA common stock on the open market between January 21, 2005, through April 21, 2005, inclusive. Excluded from the Class are MBNA, its subsidiaries and affiliates, the Individual Defendants, members of the immediate families of each of the Individual Defendants, any entities in which any of the defendants has a controlling interest, and the legal representatives, heirs, successors, affiliates or assigns of any of the foregoing excluded persons and entities.

53.    This action is properly maintainable as a class action because:

a.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, in excess of 1.2 billion shares of MBNA common stock were outstanding and actively traded on the New York Stock Exchange. Upon

information and belief, plaintiff believes that there are at least thousands of members of the Class;

      b.     Plaintiff's claims are typical of the claims of the other members of the Class, as plaintiff and the members of the Class purchased MBNA securities and sustained damages as a result of defendants' wrongful conduct complained of herein;

      c.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

      d.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

      e.     The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to plaintiff and the Class include, among others:

          (i)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

          (ii)     Whether the documents, releases, reports and/or statements disseminated to the investing public and to purchasers of MBNA securities during the Class

Period omitted or misrepresented material facts about the financial condition, business and income of MBNA;

        (iii)    Whether defendants have acted with knowledge or with reckless disregard for the truth in omitting to state and/or misrepresenting material facts;

        (iv)    Whether, during the Class Period, the market price of MBNA securities were artificially inflated due to the non-disclosures and/or material misrepresentations complained of herein;

        (v)    Whether the defendants participated in and pursued the common course of conduct complained of herein; and

        (vi)    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

    f.    Plaintiff anticipates no unusual difficulties in the management of this action is a class action.

54.    At all relevant times, the market for MBNA common stock was an efficient market for the following reasons, among others:

    a.    MBNA common stock meets the requirements for listing, and is listed, on the NASDAQ;

    b.    During the Class Period, millions of shares of MBNA common stock were traded on the open market;

    c.    As a regulated issuer, MBNA filed periodic public reports with the SEC; and

    d.    MBNA was followed by several securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their

respective brokerage firms. These reports were publicly available and entered the public marketplace.

55. As a result, the market for MBNA common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in MBNA's common stock price. Under these circumstances, all acquirers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

56. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBNA who knew that those statements were false when made.

19

57.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE
### EXCHANGE ACT AND RULE 10b-5 THEREUNDER

58.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

59.    Throughout the Class Period, defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of MBNA securities.

60.    The purpose and effect of defendants' plan, scheme and course of conduct was to artificially inflate the price of MBNA securities and to artificially maintain the market price of MBNA securities.

61.    Defendants, who include the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other MBNA personnel to the SEC, securities analysts and members of the investing public, including plaintiff and the Class.

20

62.     As a result of the foregoing, the market price of MBNA securities was artificially inflated during the Class Period.  In ignorance of the falsity of the reports and statements and, in particular, the material misstatements regarding the reliability of the positive results of the interim study, and the deceptive and manipulative devices and contrivances by the defendants, plaintiff and the other members of the Class relied, to their damage, on the reports and statements described above and/or the integrity of the market price of MBNA securities during the Class Period in purchasing MBNA securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

63.     Had plaintiff and the other members of the Class known of the material adverse information which defendants did not disclose, they would not have purchased MBNA securities at the artificially inflated prices that they did.

64.     Defendants' concealment of this material information served only to harm plaintiff and the other members of the Class who purchased MBNA securities in ignorance of the financial risk to them as a result of such nondisclosures.

65.     As a result of the wrongful conduct alleged herein, plaintiff and the other members of the Class have suffered damages in an amount to be established at trial.

66.     By reason of the foregoing, defendants have violated Section 10(b) Act and Rule 10b-5 promulgated thereunder and are liable to plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of MBNA securities during the Class Period.

21

## COUNT II
## LIABILITY OF INDIVIDUAL DEFENDANTS
## PURSUANT TO SECTION 20(A)
## OF THE EXCHANGE ACT

67.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

68.    During the Class Period, each of the Individual Defendants, by virtue of his office or offices at, and/or directorship of MBNA and his specific acts, was a controlling person of MBNA within the meaning of Section 20(a) of the Exchange Act.

69.    Each of the Individual Defendant's positions made him privy to, and provided him with actual knowledge of, the material facts which MBNA concealed from plaintiff and the other members of the Class during the Class Period.

70.    Each of the Individual Defendants had the power and influence, and exercised same, to cause MBNA to engage in the unlawful conduct and practices complained of herein by causing MBNA to disseminate the false and misleading information referred to above.

71.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.    By virtue of the conduct alleged above, defendants are liable to the plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their purchase of MBNA securities during the Class Period.

WHEREFORE, plaintiff, on his own behalf and on behalf of the other members of the Class, demands judgment against the defendants as follows:

22

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying plaintiff as the Class Representatives and his counsel as Class Counsel;

C.    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all defendants, jointly and severally, in favor of plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.    Awarding plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

F.    Awarding plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper in light of all the circumstances of this case.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 13, 2005

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

By: _____

Joseph A. Rosenthal (DSBA No. 234)
Jeffrey S. Goddess (DSBA No. 630)
919 Market Street, Suite 1401
Wilmington, DE 19801
(302) 656-4433
Attorneys for Plaintiffs

Lester L. Levy
Michael A. Schwartz
Caroline S. Curtiss
WOLF POPPER LLP
845 Third Avenue
New York, New York 10022
Tel.: (212) 759-4600
Fax: (212) 486-2093

## PLAINTIFF'S CERTIFICATION

I, Greg Penn, hereby state:

1.   I have reviewed the complaint against MBNA Corp. ("MBNA") and certain of its officers and directors in the action styled Penn v. MBNA Corp., et al and have authorized the filing of the complaint and/or lead motion on my behalf by Wolf Popper LLP.

2.   I did not purchase the securities that are the subject of the action at the direction of counsel or in order to participate in this private action.

3.   I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   During the Class Period alleged in the Complaint, I made the following transactions in MBNA common stock:

(Buy, Sell, Exchange, Call, Put, Etc.)

| Transaction Type/Security | Trade Date | No. of Shares | Price Per Share |
|---|---|---|---|
| Buy | 4/20/05 | 215 | $23.20 |
| Sell | 4/22/05 | 215 | $18.52 |

5.   During the three-year period preceding the date of my signing this certification, I have sought to serve, or have served, as representative on behalf of a class in the following private action(s) arising under the federal securities laws (if none, state "none"):


6.   I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12 day of May, 2005.

Greg Penn